UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

In re                                                                Chapter 7
Chris A. Reichartz and
Carrie L. Reichartz,                                         Case No. 14-23244-svk

        Debtors.

---

Landmark Credit Union

        Plaintiff,

v.                                                                    Adv. No. 14-2206

Chris A. Reichartz and
Carrie L. Reichartz,

        Defendants.

---

**MEMORANDUM DECISION**

---

This case involves car loans made to debtors who acted as "straw borrowers" for a friend who owned a car dealership and promised to repay the loans when he sold the cars. The cars, if they existed, have vanished, and the car dealer is in jail. The creditor seeks a declaration that the debtors' debt on the car loans is nondischargeable.

**FACTS**

On November 6, 2007, Carrie Watkins, now known as Carrie Reichartz ("Carrie"), purported to purchase a 2007 Toyota Camry from Northwoods Motors ("Northwoods"). (Def. Findings of Fact, ECF 16 at 2.) To finance the purchase, she borrowed $25,880.50 from Landmark Credit Union ("Landmark") and signed a consumer note and chattel security agreement granting Landmark a security interest in the Camry. (Aff. of Milton Prosek, ECF 23 at 2, Exs. C, D.)

On November 27, 2007, Carrie purported to purchase a 2004 Pontiac Grand Prix from Northwoods. (ECF 16 at 3.) She borrowed $14,443.60 from Wiscor Credit Union ("Wiscor") to finance this purchase and signed a motor vehicle consumer simple interest installment sale and security agreement granting Wiscor a security interest in the Grand Prix. (ECF 23 at 2, Ex. F.) On December 29, 2009, as a result of a consolidation, Landmark took over Wiscor's loans. (*Id.*, Ex. E.)

On December 19, 2007, Carrie's boyfriend and now husband, Chris Reichartz ("Chris"), purportedly purchased a 2006 Hummer H2. (ECF 16 at 1.) He borrowed $49,191.46 from Landmark and signed a consumer note and chattel security agreement granting Landmark a security interest in the Hummer. (Aff. of Milton Prosek, ECF at 2, Exs. A, B.)

At his deposition, Chris testified that he took out multiple car loans to "help out" Northwoods, a car dealership owned by Carrie's friend, Steven Coffee. (ECF 24 at 8.) Specifically, he took out loans "as a favor to Mr. Coffee." (*Id.* at 9.) He could not remember if he was offered or received anything for this favor. (*Id.*) Someone picked Landmark as the lender for him. (*Id.* at 13.) He never inspected the vehicles or drove them before obtaining the loans. (*Id.* at 11 – 12.) In fact, he never even saw the Hummer before he financed it, although later he learned Coffee was driving the Hummer. (*Id.* at 11.) He gave the loan proceeds to Northwoods and waited for the Hummer, which he never received. (*Id.* at 12 – 13.) Chris testified that he intended to keep the Hummer at his residence, although Carrie contradicted that testimony in her deposition. (*Id*. at 19, 68.) He never received the Hummer, although a Certificate of Record copy issued by the Wisconsin Department of Transportation after this litigation started apparently lists Chris as the primary owner and Landmark as a secured creditor. (ECF 16 at 2 – 3.) There is no evidence in the record as to the location of the Hummer.

Carrie, a law school graduate who practiced law for six to seven years, testified that Coffee approached her in October 2007 to "take out a loan on a vehicle that was on his lot." (*Id.* at 48.) According to Carrie, "Northwoods didn't have enough money to keep the doors open. So, to purchase [the Camry], that would give them some money to keep the doors open, thereby, sell that vehicle, and he'd hopefully pay it off within two months." (*Id.* at 49.) She testified that she never saw either the Camry or the Grand Prix, and she never had any intention of taking possession of either vehicle. (*Id.* at 51.) She made a handful of payments on the loans, and Coffee was supposed to reimburse her for the payments but never did. (*Id.* at 55 – 56.) She testified that Coffee promised to give them money for obtaining loans for the dealership. (*Id.* at 58 – 59.) Two years later, in 2009, she contacted the FBI when she realized "what Steve was doing, that these cars were not on his lots, that these loans were the same loans – multiple loans on one car." (*Id*. at 73 – 74.)

On March 27, 2014, Carrie and Chris filed a Chapter 7 petition. Landmark filed a timely complaint to determine that the debt for the loans is nondischargeable under 11 U.S.C. § 523(a)(2)(A). The parties have filed cross-motions for summary judgment.

## ANALYSIS

### I.  Summary Judgment Standard

Summary judgment is governed by Rule 7056 of the Federal Rules of Bankruptcy Procedure, incorporating Rule 56 of the Federal Rules of Civil Procedure, and should be granted if the movant can establish that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When parties file cross-motions for summary

judgment, the court must separately evaluate each motion using the same standard applied to a motion for summary judgement. *See United Air Lines, Inc. v. HSBC Bank USA (In re United Air Lines, Inc.)*, 453 F.3d 463, 468 (7th Cir. 2006) ("With cross summary judgment motions, we construe all facts and inferences therefrom 'in favor of the party against whom the motion under consideration is made.'").

## II. Fraud and False Pretenses under § 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by false pretenses, a false representation, or actual fraud . . ." The creditor bears the burden of proving the elements of the claim by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

The parties have focused on the "false representation" aspect of § 523(a)(2)(A), with the Debtors contending that they did not make any false representations about purchasing or financing the vehicles. They point out that they intended to purchase the vehicles and resell them, a purpose allegedly permitted under the loan documents. They allege that they actually purchased the vehicles, but the only evidence that any purchase was ever consummated is a reference to a post-litigation report on the Hummer from the Wisconsin Department of Transportation. When the Debtors filed their original bankruptcy schedules, they did not claim an ownership interest in any of the vehicles; they later amended their Schedules to list the Hummer, but there is no indication of its location. At his deposition, Chris testified unequivocally that he never received the Hummer. (ECF 24 at 21.)

Landmark emphasizes the Debtors' promise in the loan documents to keep the vehicles at their residence. Carrie testified that she never intended to do that, and that neither did Chris. Chris testified that even though he took out the loan as a favor to Coffee, and never saw the car

4

before purchasing it, he intended to receive it and keep it at their residence. This confusing testimony does little to support the inference that the Debtors did not intend to dupe Landmark.

Although the prototypical debt within the scope of § 523(a)(2)(A) involves misrepresentation, the section also includes "false pretenses" and "actual fraud." In *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000), the court noted that "fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or suppression of truth." Section 523(a)(2)(A) thus encompasses a broader category of debts than misrepresentation, including those involving "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *Id.* at 893; *see also Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1288 (8th Cir. 1987) ("Clearly, the Bankruptcy Code did not intend to protect property obtained by 'deceit, artifice, trick [or] design.' A borrower has the duty to divulge all material facts to the lender. While it is certainly not practicable to require the debtor to 'bare his soul' before the creditor, the creditor has the right to know those facts touching upon the essence of the transaction.")

In *McClellan*, the creditor sold his business assets to the debtor's brother for $200,000, taking back a promissory note for the purchase price. When the debtor's brother defaulted, the creditor sued in state court. While the suit was pending, the brother "sold" the machinery to his sister, the debtor, for $10. She then sold the machinery for $160,000, and then filed a Chapter 7 case. The bankruptcy court dismissed the complaint based on *Field v. Mans*, 516 U.S. 59, 68 (1995), where the Court "scoffed at the idea that a debt could be nondischargeable under the fraud exception of § 523(a)(2)(A) without a showing of material misrepresentation and reliance on the statement." *McClellan,* 217 F.3d at 892. The district court affirmed. However, the court

5

of appeals reversed, explaining that nothing in the Supreme Court's decision suggests that misrepresentation is the only type of fraud that can give rise to a claim under § 523(a)(2)(A). The Seventh Circuit concluded that misrepresentation and reliance is not always required to establish fraud. *See also Metro. Real Estate Corp. v. Gard (In re Gard)*, 327 B.R. 372, 375-76 (Bankr. N.D. Ind. 2003) ("Rather than looking for representations which might have been made, *McClellan* requires the court to focus upon the debtor's intent. So long as the debtor acted with the 'intent to defraud' it does not matter whether the fraud 'was implemented by a misrepresentation or by some other improper means.'").

In *Van Horne*, the debtor obtained a loan from his mother-in-law. He made interest payments, but was unable to repay the principal when due. Within days of renegotiating a renewal of the loan, he moved out of the family home and filed for divorce. The court found that the debtor's conduct in omitting the material fact that he intended to divorce the creditor's daughter was proof that the debtor intended to deceive the creditor and constituted fraud or false pretenses. 823 F.2d at 1288; *see also Apte v. Japra (In re Apte),* 96 F.3d 1319, 1324 (9th Cir. 1996) (a party to a business transaction has a duty to disclose facts basic to the transaction if he knows that the other party is entering into it under a mistake of fact and the other would reasonably expect disclosure of such facts based on their relationship, trade custom or other objective circumstances).

In this case, the Debtors' role as fronts for Coffee was obviously a material fact that they suppressed in obtaining the loans from Landmark. The Debtors' intent, as Carrie readily admitted, was to obtain loans for Coffee to keep Northwoods in business. In order to continue the façade that these were garden-variety car loans, the Debtors made a few payments, but that does not change the fraudulent nature of the inception of the transactions. Contrary to the

6

Debtors' arguments, under *McClellan*, Landmark is not required to prove that it justifiably relied on the Debtors' misrepresentations in the loan documents. Instead, it must show that the Debtors intended to deceive Landmark. That intent is apparent in the Debtors' failure to disclose material facts including the very purpose of the loans.

In addition to fraud as described by *McClellan*, this case has elements of false pretenses. "False pretenses in the context of § 523(a)(2)(A) involves implied misrepresentations or conduct intended to create or foster a false impression." *Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 771 (Bankr. N.D. Ill. 2010). A bankruptcy court defined false pretenses as

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor. . . . A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996) (internal quotation omitted). Overt misrepresentations are not a prerequisite for a false pretenses claim. *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 928 (Bankr. N.D. Ill. 1996). "Instead, omissions or a failure to disclose on the part of a debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.* Silence or concealment may constitute false pretenses. *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 86 (Bankr. N.D. Ill. 2002).

Whether a claim is for misrepresentation, false pretenses or actual fraud, the creditor must prove that the debtor intended to deceive or defraud the creditor. *In re Kimzey*, 761 F.2d 421, 423 (7th Cir. 1985). The court in *Kimzey* noted that "an intent to deceive may logically be

7

inferred from a false representation which the debtor knows or should know will induce another to make a loan." *Id.* at 424. In *Van Horne*, the Eighth Circuit Court of Appeals observed:

> Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred. When the creditor introduces circumstantial evidence proving the debtor's intent to deceive, the debtor cannot overcome that inference with an unsupported assertion of honest intent. The focus is, then, on whether the debtor's actions appear so inconsistent with his self-serving statement of intent that the proof leads the court to disbelieve the debtor.

823 F.2d at 1287-88 (internal citations and quotations omitted).

In this case, Carrie and Chris went to Landmark and other lenders to obtain car loans. They did not tell Landmark that the purpose of the loans was to finance Northwoods. They gave the impression that they were purchasing the vehicles for their own personal use, and that Landmark would have the first priority lien on the vehicles. This impression was false. Having never seen the vehicles, Carrie and Chris did not even know whether they existed. They did not know whether Landmark would have the first priority lien on the vehicles, and Carrie learned later that in actuality the vehicles were not on Steven Coffee's lot and there were multiple liens on each car.

The Debtors' argument that they made no misrepresentations because "reselling cars" is a permitted consumer use of the vehicles is spurious. Carrie and Chris never intended to resell the cars. They intended that <u>Coffee</u> would resell the cars at his car dealership. Carrie and Chris argue that they intended to repay the car loans, but the circumstances contradict this contention. The record shows that the Debtors intended that <u>Coffee</u> would repay the car loans when he sold the vehicles. Moreover, the fact that Carrie and Chris went to multiple lenders in addition to Landmark is strong evidence that they were knowing participants in Coffee's ruse. Presumably

8

they knew that their scheme would be discovered if they obtained too many "personal use" car loans from one lender.

The Seventh Circuit Court of Appeals faced a similar factual scenario in *Mayer v. Spanel Int'l*, 51 F.3d 670, 672-73 (7th Cir. 1995). In that case, the Mayers borrowed money to purchase a hotel, and Mr. Mayer promised to subsidize the hotel's operations until it turned a profit. However, the Mayers had no intention of operating the hotel, underwriting its losses, or paying off the loan. They were serving as fronts for their friends Donald and Rosemarie Monti who could not have obtained the loan in their own names, since Mr. Monti was in bankruptcy and Mrs. Monti had no income. The Mayers agreed to serve as straw borrowers because of their friendship with the Montis. The Montis were expected to make the loan repayments, but failed to do so. The bank foreclosed on the hotel and obtained a deficiency judgment against the Mayers. The Mayers filed bankruptcy, and the bankruptcy judge held their debt to the bank nondischargeable under § 523(a)(2)(A) after concluding that the Mayers had defrauded the bank.

This case has very few distinguishing features from *Mayer*. Like the Mayers, Carrie and Chris had no intention of driving the vehicles or repaying the loans. They were looking to Coffee to repay the loans when the vehicles were sold. Carrie and Chris might point to the fact that the Mayers passed the mail from the bank to the Montis unopened, while Carrie and Chris made a few payments to Landmark. But in essence, the transaction is the same: obtaining loans for someone else who could not qualify for those loans, without bothering to tell the creditor. In *Mayer* and in this case, the debtors failed to disclose the true identity of the person ultimately responsible for repaying the loan. As the court of appeals noted in *Van Horne*, "Bankruptcy courts have overwhelmingly held that a debtor's silence regarding a material fact can constitute a false representation actionable under section 523(a)(2)(A)." 823 F.2d at 1288.

9

In *Hancock Bank v. Harper (In re Harper)*, 475 B.R. 540 (Bankr. S.D. Miss. 2012), the debtor entered into a retail installment contract representing that he was purchasing a mobile home and pledging it as collateral to secure repayment. Ultimately, the bank discovered that the debtor never purchased the mobile home, but was instead going to use the funds to construct a nightclub. The bank brought a nondischargeability action under § 523(a)(2)(A). The court found that the mobile home transaction was a sham, and determined that the bank had sustained its burden of proof that the debt was nondischargeable. According to the court, the debtor's silence as to the "side-arrangement" between himself and another individual to either use the funds for the nightclub or to rent the mobile home out as an investment constituted false pretenses or false representation. *Id.* at 548. Similarly here, the Debtors never accepted delivery of the vehicles, never took possession, and, except for later learning that Coffee was driving the Hummer, never knew whether the vehicles actually existed. Together with their failure to disclose the side deal with Coffee, these facts demonstrate the Debtors' false pretenses and intent to deceive Landmark.

In *Qari v. Patelco Credit Union (In re Qari)*, 357 B.R. 793, 796 (Bankr. N.D. Cal. 2006), the debtor obtained a loan from the credit union to purchase a vehicle, "ostensibly for his personal use." However, the debtor intended to use the vehicle in his limousine business, but never disclosed that to the credit union despite his knowledge that the credit union did not make business loans. After driving the vehicle for a few weeks, the debtor consigned the vehicle to a car dealership for resale. The vehicle was sold, but the proceeds were not paid to the credit union. The debtor applied for and received a second vehicle loan from the credit union, and again the debtor consigned the vehicle to a dealership for resale. The debtor failed to make the

required payments on the two loans, and the credit union obtained a judgment in state court. The court analyzed the issue under the "actual fraud" provision of § 523(a)(2)(A):

> The Debtor's failure to disclose to [the credit union] that he intended to use the Mercedes in his limousine business constitutes a false representation within the meaning of 11 U.S.C. § 523(a)(2)(A). Given the Debtor's admission that he knew that [the credit union] did not make business loans, the Court finds that the Debtor had a duty to disclose to [the creditor] that he intended to use the Mercedes for business purposes. His failure to disclose this information, knowing its significance, therefore, also satisfies the "knowledge of falsity" requirement. The Court also finds and concludes that the Debtor failed to disclose this information, intending to deceive [the credit union]. The Debtor wanted to obtain the loans and knew [the credit union] would not give him the loan if he disclosed his intended use of the Mercedes.

*Id.* at 798-99; *see also Huntington Nat'l Bank v. McManus (In re McManus)*, 292 B.R. 157 (Bankr. E.D. Mich. 2003) (finding debt nondischargeable based on debtor's participation in scheme to obtain loan on luxury vehicle as straw buyer).

Here, the Debtors in effect were obtaining business loans for Coffee's struggling car dealership. Carrie, a practicing attorney, presumably knew that Coffee (who was having trouble "keeping his doors open") could not obtain these loans directly from Landmark. Instead, she agreed to obtain the loans for him, under the pretext that she was buying a vehicle and obtaining a garden-variety car loan. She expected to be paid for her participation in this ruse. She enlisted her boyfriend, Chris, in the scheme, and he obtained a $49,000 loan from Landmark for a luxury vehicle he never test drove, inspected or even knew existed when he took out the loan. The only reasonable inferences that can be drawn from these facts are that Carrie and Chris intended to deceive Landmark into making these loans, knowing that Landmark would never make loans to the true borrower, Coffee. The circumstances show that Carrie and Chris acted with the understanding that Coffee would compensate them for obtaining this financing and repay them for the loan payments they made to Landmark. While they initially may have naively believed

11

that Coffee would sell the cars quickly, when the months went by without any sales, apparently they did nothing to attempt to investigate or alert Landmark to the true nature of the transaction. Even in the face of all these circumstances, the Debtors urge that they intended to pay Landmark, as soon as Coffee sold the cars.

Similar protestations of honest intent were present in *J.C. Penney Co. v. Shanahan*, 151 B.R. 44 (Bankr. W.D.N.Y. 1993). In that case, the creditor sued under § 523(a)(2)(A) for the debtor's use of a credit card to buy Christmas presents at a time when she was unemployed and heavily in debt. In response to the debtor's claim of an honest intent to repay the creditor, the court explained that "[i]t seems clear that if damage results from trickery or overreaching or sham or the like, then that is sufficient to establish fraud as to any consequent damage even if the debtor had hoped to make the other party whole." *Id.* at 48. According to the court:

> Few would disagree that . . . if I were to obtain [a loan] on the basis of that deception, and if damage were to result, I would be defrauding the creditor even if all the while my honest intention had been to repay the loan if it were to be obtained. It is not my prerogative to decide what the lender needs to know, and I cannot justify my placing the lender at risk through intentional falsehoods on the grounds that I meant the lender ultimately no harm.

*Id.* at 48-49.

## CONCLUSION

In general, determining the dischargeability of a debt based on fraud (especially where a state court has not previously considered the issue) is not appropriate for summary judgment. *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*, 991 F.2d 1249, 1258 (7th Cir. 1993) ("Due to the difficulty of proving a subjective state of mind, cases involving motivation and intent are usually not appropriate for summary judgment."); *Southwest Fin. Serv. of Las Cruces, Inc. v. Lopez (In re Lopez)*, No. NM-07-064, 2008 Bankr. LEXIS 83, *14-15 (B.A.P. 10th Cir. Jan. 23, 2008) ("We think Debtor has sufficiently disputed

the issue of her alleged 'intent to deceive' so as to prevent summary judgment. As the bankruptcy court acknowledged, the issue of fraudulent intent is a material issue not easily subject to adjudication by summary judgment."). In this case, however, the Debtors have not sufficiently disputed the issue, and the Court finds that the reasonable inferences to be drawn from the circumstances presented amply demonstrate that Landmark has met its burden of proof that these debts were created by false pretenses, false representations or actual fraud. The Debtors' self-serving statements that they did not intend to deceive Landmark are inconsistent with their actions. Knowing that Landmark would not make loans to Coffee, the Debtors obtained loans for him, without inspecting the alleged collateral, determining that it was free of liens or even confirming that the collateral existed. The Debtors never told Landmark that the purpose of the loans was to "keep Northwoods' doors open." This is a material term of the loan transaction and should have been disclosed. Both Debtors obtained "multiple" vehicle loans for Coffee, but only one each at Landmark, suggesting an attempt to keep the scheme below Landmark's radar. According to Carrie, the Debtors never intended to drive, possess or use the vehicles, but all of these representations are either expressed or implied in the loan documents they signed.

In sum, Landmark's motion for summary judgment should be granted, and the Debtors' motion for summary judgment should be denied. A separate order will be entered.

Dated: April 20, 2015

By the Court:

*Susan Kelley*
Susan V. Kelley
Chief U.S. Bankruptcy Judge